820 So.2d 1255 (2002)
STATE of Louisiana In the Interest of Sebastian T. SATCHFIELD
v.
Tommy GUILLOT.
No. 2002-0150.
Court of Appeal of Louisiana, Third Circuit.
June 26, 2002.
*1256 Douglas L. Bryan, Riddle Law Offices, Marksville, LA, for Defendant/Appellant Tommy James Guillot, Dusty Satchfield Brown.
Angelo J. Piazza, III, Attorney at Law, Marksville, LA, for Plaintiffs/Appellees Marvin Guillot, Sr., Dola Guillot.
Court composed of SYLVIA R. COOKS, JIMMIE C. PETERS, and GLENN B. GREMILLION, Judges.
PETERS, J.
Tommy Guillot and Dusty Satchfield Brown, parents of a minor child, Sebastian T. Satchfield, appeal the trial court's judgment granting Marvin and Dola Guillot, grandparents of the minor child, specific visitation rights to the minor child. For the follow reasons, we reverse the trial court's judgment and render judgment, dismissing the grandparents' request for specific visitation rights.

DISCUSSION OF THE RECORD

Procedural History
Dusty Satchfield Brown (Dusty) gave birth to Sebastian T. Satchfield (Sebastian) on March 10, 1994. Both she and Sebastian's father, Tommy Guillot (Tommy), were teenagers at the time, and Sebastian's birth was not the result of their cohabitation. The litigation currently before the court began as an action by the State of Louisiana, through the Department of Social Services, Office of Family Support (state), to establish paternity and to obtain child support on behalf of Sebastian. After blood analysis established that Tommy was Sebastian's biological father, he acknowledged paternity and requested that joint custody be awarded. After a January 24, 1995 hearing, the trial court rendered judgment awarding Tommy and Dusty joint custody of Sebastian, naming Dusty as primary custodian and granting Tommy extensive visitation privileges. On July 22, 1998, Tommy and Dusty petitioned the trial court to modify the joint custody arrangement by naming Tommy as primary custodian. The trial court signed a judgment to that effect on August 17, 1998. In that judgment, Dusty was awarded extensive visitation privileges.
On March 10, 2000, Marvin and Dola Guillot (referred to hereinafter individually as "Marvin" or "Dola," or collectively as "the Guillots") filed a rule seeking specific visitation rights to Sebastian.[1] On June 12, 2000, Tommy responded to the rule by filing a motion for summary judgment and peremptory exceptions of no cause and no right of action. At a hearing held July 16, 2001, the trial court denied the motion and the exceptions. After a November 26, 2001 trial, the trial court rendered judgment awarding the Guillots supervised visitation privileges to Sebastian on the first Saturday of each month from 9:00 a.m. until 1:00 p.m. at a public place within Avoyelles Parish, Louisiana. Tommy and Dusty appealed this judgment.

Evidence Presented at Trial
There is actually little dispute concerning the factual background giving rise to *1257 this litigation. Sebastian was born in a Ville Platte, Louisiana hospital on March 10, 1994, and initially resided with his mother. After the initial litigation established him as Sebastian's biological father, Tommy began to exercise his visitation privileges on a regular basis. At the time, he resided with his parents and they assisted him in caring for Sebastian. Additionally, Dola often served as Sebastian's caretaker when Dusty's work or social schedule prevented her from caring for her son. When Tommy became the primary custodian, the caretaker role of the grandparents gained greater significance as he needed their assistance in caring for Sebastian when Dusty was not exercising her visitation privileges.
The relationship between Tommy and his parents began to deteriorate with Tommy's marriage to his current wife, Tara, in 1995 or 1996.[2] Initially, Tommy and Tara occupied a trailer located on the Guillots' property immediately next to their house. Because of interfamily conflicts, Tommy and Tara soon moved to another location. However, Sebastian continued to visit with his grandparents.
Sometime after Tommy and Tara relocated, both Tara and Dusty began to notice changes in Sebastian's personality that disturbed both women. Because of these observations, Sebastian's parents stopped allowing him to visit the Guillots. This resulted in the Guillots bringing suit in March of 2000. Tommy responded to the action by requesting that the trial court appoint a mental health expert to evaluate the parties and formulate a report of his findings. The trial court appointed Dr. John Simoneaux, a Pineville, Louisiana psychologist, who performed a psychological evaluation of Tommy, Tara, Marvin, Dola, and Sebastian, and prepared a report of his conclusions for the trial court. Although Dr. Simoneaux did not testify at trial, this report was introduced into evidence.
The report establishes that Dr. Simoneaux performed his psychological evaluations of Tommy, Tara, and Sebastian on April 28, 2000, and of Marvin and Dola on May 9, 2000. During these evaluations, the parties related various incidences to Dr. Simoneaux which clearly contributed to the simmering dispute within the family. He summarized his findings and recommendations as follows:
The Guillot family, including six-year-old Sebastian, was referred for psychological evaluations by a local district judge in connection with an attempt on the part of the paternal grandparents to obtain court-ordered grandparent visitation. The elder Guillot's maintain that their grandson has been unjustly and inappropriately estranged from their affections, largely due to the actions of their son's wife, Tara. They believe that the child's best interests would be served if the courts would allow regular visitation with them in their home. The Guillot's contend that they have provided substantial material and emotional benefit to the child and believe that Tara Guillot has influenced both Tommy, her husband, and Sebastian, to turn against them, to believe untrue rumors about them, and to subsequently conclude that the Guillot's are nefarious, perverse, and destructive to the child's well-being.
Tara and Tommy Guillot appear to believe that Tommy's parents, particularly his mother, have worked, almost from the beginning to discredit Tara and disrupt the marital union. Most significantly, they imply that Dola Guillot may have actually molested Sebastian in some way. At the very least, they believe *1258 that she has talked with him inappropriately about sexual matters, that she has exposed him to inappropriate sexual materials, etc. They suggest that Dola is less than discrete about exposing herself in public and, in short, they believe that she uses bad judgment in her interactions with Sebastian. Marvin Guillot is a party to this, according to Tommy and his wife, and is most culpable because he does nothing to stop his wife.
It is known that there has been open conflict over these concerns. Tommy had a fight with his aunt, culminating in him cursing at and "mooning" his aunt. Tara admits to "yelling" in response to her frustration, and there was even a "brawl" between Dola Guillot and Tara's sister on one occasion, with both saying that the other provoked the incident. Sebastian has apparently said that he is glad he moved away from his grandparents home. He also has said that his grandmother has taught him, and encouraged him to use, obscene gestures, that he has seen his grandparents naked on the couch, and that his grandmother instructed him in lying naked with his sister. He told me all of these things during my interview. It is clear that Sebastian has been involved in this dispute, if in no other way but that he has heard "talk" of the enmity between his parents and grandparents. This will only serve to hurt Sebastian over the long-run. Apart from this, however, he seems to be a delightful child, with no apparent signs of emotional distress other than his concern about this dispute. All parties were cooperative with the evaluation. Tommy is obviously upset about the estrangement from his parents and the fact that he feels torn between his wife and his family of origin. For the most part, however, he is supportive of his wife and critical of his family, particularly his mother. Tara Guillot is obviously angry. She believes that Dola and Marvin have set out on a campaign to discredit her, turn the child and Tommy against her, and to even go after her family. She wants nothing to do with the elder Guillot's. Marvin and Dola claim complete innocence. Marvin seems proud of the fact that he has been able to provide considerable material benefit to the child, while Dola says that she has done nothing to hurt the child in any way. Her presentation, however, does suggest a fascination and interest with many of the relatively "petty" concerns in this matter. It was not my impression, however, and the psychological testing did not indicate, that neither Dola nor Marvin could be capable of the type of abuses that have been alleged. While they certainly have some faults and they have not fully accepted Tara, I do not believe that they would set out, with design, to intentionally hurt young Sebastian.
Of course, Tara and Tommy are bitter. If one assumes that they sincerely believe that the elder Guillots are guilty of all that they charge, their reactions are understandable and logical. Besides, they argue that since they are competent parents, they should not be compelled to have their child visit in a home that they do not believe provides a proper environment for a young child. I have no reason to believe, based on these results, that either suffer from any kind of personality disturbance or psychological impairment that would adversely affect their ability to serve as proper parents to Sebastian. Tommy is rather dependent, and may be somewhat paranoid, but he clearly loves his son. I worry that this estrangement from his parents will eventually be quite unsettling to him. It may be a good idea for *1259 him to seek help with his attitudes in this regard. I fear that it may, in the end, upset his marriagea condition that would be difficult for Sebastian. Tara is a rather high-strung person who is not very happy at this time. Most of her unhappiness seems to center around her concerns about this matter. She loves Sebastian, but sincerely believes that his grandmother has designs on hurting her and her family and on upsetting her marriage. Given the circumstances, her beliefs may well be reasonable Dola did "beat up" Tara's sister. I do believe, however, that Tara is a good mother who would not intentionally harm any child. She loves Sebastian, she obviously loves Tommy, and she deserves to have a chance at a marriage that is not disrupted by outside influences. Tara is pregnant now and is facing new impending stressors. She needs support and encouragement rather than the backbiting that has taken place recently.
Marvin and Dola seem to sincerely love Sebastian and want to spend time with him. I fear, however, that their tactics are self-defeating and will only serve to hurt Sebastian in the long-run. Both appear to be psychologically healthy. I worry, however, that the elder Mr. Guillot sees his role as a provider, one who can offer material rewards, as being paramount he tends to equate the financial support, the condos, his pool, etc., as signs of his love. It should be pointed out that one of the factors that may have been critical in the development of this estrangement was his decision to not provide land to Tommy because of his involvement with Tara. This would clearly have been an incendiary and provocative movea clear message to Tommy and Tara that Tommy's wife is not to be trusted. While Mr. Guillot may have rationalized his motives, his decisions in this regard only serve to "fan the flames" of enmity. Dola Guillot denies, of course, that she has been inappropriate with the child in any way. She does admit, with some glee, to "beating up" Tara's sister. She acknowledges that some of the "rumors" about her behavior that have been cited by Tommy have been floating around the area for some timeshe paints herself, however, as innocent in those matters as well. It is my impression that Ms. Guillot is not fully appreciative of how her behaviors might affect others, and she gets angry when others react to her in a manner that she considers to be unkind or inappropriate. She does not like Tara, and makes that very clear. Her lack of insight about her own behavior would almost certainly lead to her acting in a way that would be provocative and upsetting to others, without being aware of the reason for the upset.
Of course, this issue rests on what is in the best interest of Sebastian. As a psychologist, I strongly value the authority of parents in determining what is best for their children. For a variety of reasons, parents should be left to decide who their children visit with, how they spend their time, etc. Unless parents are proven to be incompetent in some fashion, or unless their behaviors clearly lead to harmful influences for the child, parents' decisions, I believe, should be unfettered. Tommy and Tara, even though they are not perfect, are good parents who want what they believe is best for Sebastian. It is reasonable for them to conclude that the current atmosphere with Nolan and Dola Guillot is not advantageous for Sebastian. In fact, it would be best if this dispute is never mentioned or discussed with Sebastian. I believe that Tommy and Tara probably contribute to the dispute, but they cannot *1260 completely shield Sebastian as long as the Guillot's feel as they do about Tara and have undue influence over Sebastian. I worry that some of their attitudes have already been communicated to Sebastian. It is not in this child's best interest to hear bad things about his grandparents. Ideally, he would only have positive relations with the elder Guillot's. I would suggest that it may be helpful to allow him some contact, but it will be important for Tara and Tommy to know that such contact is safethey should be allowed to supervise any contact the child has with his grandparents. While Dola and Marvin do not appear to be as "bad" as is suggested, they are not fully aware of the impact their actions have had on this child. Their interests, I fear, are short-sighted and superficial. I would urge them to cease any criticism of Tommy or Tara. They should accept graciously any contact that they can have with the child, supervised or not, and work on repairing their relationship with their children, if for no other reason than that this would be best for Sebastian.
On August 14, 2000, Dr. Ramil Baratang, a psychiatrist specializing in child and adolescent psychiatry, saw Sebastian at the request of Tommy and Tara. Tara informed the doctor that Sebastian was having nightmares about sexual situations involving the Guillots, had exhibited improper sexual behavior toward his younger step-sister, and appeared fearful of his grandmother. Dr. Baratang interviewed Sebastian on this day and continued to see him professionally thereafter. As of the time of his deposition in October of 2001, Dr. Baratang was of the opinion that Sebastian's fears of his grandmother were "genuine." At that time, the doctor still had not ruled out the possibility that Sebastian suffered from traumatic stress syndrome. He diagnosed Sebastian as having "at least an adjustment disorder with a mixed disturbance of emotions and conduct" and went on to say that Sebastian had "been exposed to fairly significant amounts of either sexual behavior or sexual material or sexual thought that would have driven him to learn this[sic] kinds of behaviors and this[sic] kinds of responses." In his professional opinion, it is not in Sebastian's best interest that he visit his grandparents.
The testimony of Tommy, Dusty, Dola, and Marvin at the trial on the rule varied little from that set forth in Dr. Simoneaux's report. According to Dola, Tara is not good enough for Tommy, Sebastian would be "better off" in her custody, and she could take care of both Tommy and Sebastian better than Tara. Additionally, she had no difficulties with Dusty as long as Dusty did not interfere with her taking care of Sebastian. Marvin continued to support his wife, but acknowledged that he "can't blame Tommy" for what he did in protecting his son.
Dusty had no difficulties with the Guillots until she began to hear things from Sebastian which disturbed her. According to Dusty, Sebastian related incidences of his grandmother allowing him to play with a knife at age four, allowing him to ride a four-wheeler against Dusty's wishes, and punishing him by making him place his hand on an electric fence.
It was with this background that the trial court issued its opinion granting the Guillots the specific visitation privilege involved herein. In its oral reasons for judgment, the trial court stated the following:
This case is one of a very unique nature presented to this court. First of all, I want to tell all of you here, today, that as a matter of law, the authority over children is something that's basically *1261 regulated and reserved, I say, all to the parents.
I also want to tell you, who are all here, today, that that there is something that I have observed in the demeanor of the witnesses that have been presented here, today, that really disheartens me very, very much. And that is, that there is a hostility in this family that desperately needs caring. There is hostility between mother and son; between father and son; between son and mother and father. There is an inlaw hostility that also exists, that I've picked up on. Although, I have to say that I have not heard testimony here, today, from the youngest Guillot's present wife.
I am convinced that this particular case presents the court with a unique opportunity into the law. I am satisfied, under the evidence presented, that there is a very special relationship that exists between the child, Sebastian, and his paternal grandparents. That relationship, as supported by the evidence, is one that was developed in the every early years of this child's life. The evidence is uncontroverted. The grandparents played a substantial role prior to Tommy Guillot marrying his present wife.
There are some hostilities that developed at that point in time. Perhaps it's one of control issue that developed before that time, as reflected by the testimony of Tommy Guillot, himself, his mother having control over him, and him having difficulty pleasing her even with the women that he would bring home. And, I really feel, very strongly that some work needs to be done, here, between the father of the child and his parents.
I see no reason, under these circumstances, to say that the grandparents cannot have a particular time to visit with the child on a supervised basis. The reason that I say "supervised," with appropriate supervision, perhaps the evidence taken as a whole is true. Perhaps if it were some unwise decisions that were made with a knife, or with riding a four wheeler. Perhaps those were made. If they were made, perhaps they're not the wisest choices. But these choices are not something that could not be satisfied to the court's own mind that the best interest and welfare of the child could be maintained by having supervision over the visits. I see no reason why these grandparents, who have contributed so much to this child's life in the first five (5) years of his life, should not be afforded an opportunity to visit with their grandchild.
I make this ruling, because I find extraordinary circumstances exist under the law. And, it is a ruling that I will not make very often, but require special evidence that I've heard in this proceeding; and because of the family tension that I see, that does exist, but needs working on.
I also want to say for the record, there are two (2) medical opinions that have been presented to the court. I read the deposition of Dr. Baratang, and I am well aware that Dr. Baratang feels that we ought to wait until the child makes a choice to see his grandmother. We're dealing with a seven (7) year old child.
I place more credibility and more weight in the professional opinion of Dr. Simoneaux, who had an opportunity to visit with the entire family here. The record will reflect that he not only visited with the grandparents, but also with the father of the child, the stepmother of the child, and the child. It is Dr. Simoneaux's opinion.

*1262 When I first heard this case, I told you I would weigh heavily on the professional guidance that we got. And, that professional guidance, as I read Dr. Simoneaux's report as a whole, suggest to the court that supervised visitation will probably be in the best interest of this child.
ACCORDINGLY, I do award "supervised visitation" to the grandparents with these provisions:
There's to be a special condition that the grandparents are to cease and desist from making any derogatory or inflammatory remarks about the father or the stepmother or the mother of the child, in the presence of the child.
The same provision applies to the father. He is not to make any derogatory remarks about his parents to his child. And, in fact, the parties are encouraged and ordered by this court to encourage a nurturing and loving relationship between the grandparents and the child, and between themselves and their own parents. There's a lot of work that has to be done in this case.
Tommy and Dusty assert four assignments of error in their appeal of the trial court's judgment.

OPINION
All issues concerning non-parental visitation requests must now be considered in light of the United States Supreme Court decision in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In that case, the Supreme Court found that a Washington state statute allowing visitation rights to paternal grandparents violated the mother's due process right to make decisions concerning the care, custody, and control of her children.
In Troxel, the two children at issue were born of a non-marital relationship between Tommie Granville and Brad Troxel. The relationship ended in 1991, and Brad committed suicide in May of 1993. Both before and immediately after Brad's suicide, the two children visited in the home of Brad's parents. However, in October of 1993, Tommie informed the grandparents that she desired to limit their visitation with the children, and the grandparents responded by filing suit to obtain visitation rights to their grandchildren pursuant to Section 26.10.160(3) of the Revised Code of Washington, which provides:
Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.
The Supreme Court granted certiorari in the case to consider "whether § 26.10.160(3), as applied to Tommie Granville and her family, violates the Federal Constitution." Troxel, 530 U.S. at 65, 120 S.Ct. at 2059 (emphasis added). In concluding that the statute did violate the United States Constitution, the Supreme Court stated the following:
The liberty interest at issue in this casethe interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interest recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the *1263 right "to direct the upbringing and education of children under their control." We explained in Pierce that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Id., at 535, 45 S.Ct. 571. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Id., at 166, 64 S.Ct. 438.
In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children `come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" (citation omitted)); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); Parham v. J.R., 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course"); Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); Glucksberg, supra, at 720, 117 S.Ct. 2258 ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the `liberty' specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children" (citing Meyer and Pierce)). In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of the children.
Id. at 65-66, 120 S.Ct. at 2060.
In one of their assignments of error, Tommy and Dusty assert that the trial court's decision violates the holding in Troxel.
In Louisiana, authority for non-parent visitation rights may be found in both La. R.S. 9:344 and La.Civ.Code art. 136(B). Tommy and Dusty contend that La.Civ. Code art. 136(B) is not applicable to the matter before the court because it relates to matters involving divorce, and that, by its terms, La.R.S. 9:344 is not applicable. As such, they assert as an assignment of error that the trial court erred in not granting Tommy's exception of no cause of action.
*1264 We agree that La.R.S. 9:344 is not applicable to the case at hand. It relates to situations in which the parent who is the child of the grandparents seeking visitation privileges has been incarcerated or interdicted or has died. Furthermore, the statute applies to factual situations in which the grandchild or grandchildren at issue were either born of the marriage between the deceased party and the other parent, or born of a concubinage relationship. Tommy is alive, and Sebastian was not born of a marriage or concubinage relationship. Because La.R.S. 9:344 is not applicable to the matter before us, we need not consider whether it violates the holding in Troxel.
The trial court based its decision on La.Civ.Code art. 136(B), which provides:
Under extraordinary circumstances, a relative, by blood or affinity, or a former stepparent or stepgrandparent, not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child. In determining the best interest of the child, the court shall consider:
(1) The length and quality of the prior relationship between the child and the relative.
(2) Whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative.
(3) The preference of the child if he is determined to be of sufficient maturity to express a preference.
(4) The willingness of the relative to encourage a close relationship between the child and his parent or parents.
(5) The mental and physical health of the child and the relative.
Tommy and Dusty assert in their first assignment of error that this Article applies only to visitation issues arising from a divorce action, given its location within the Louisiana Civil Code. We disagree. While we note that La.Civ.Code art. 136(B) is found in Section 3 ("Child Custody") of Chapter 2 ("Provisional and Incidental Proceedings") of Title V ("Divorce") of the Louisiana Civil Code, La.Civ.Code art. 136(C) also provides that, "[i]n the event of a conflict between this Article and R.S. 9:344 or 345, the provisions of the statute shall supersede those of this Article." As previously stated, La.R.S. 9:344 provides for non-parental visitation of a child born in an open concubinage situation as well as a marriage. We find that La.Civ.Code art. 136(B) is applicable to those situations not covered by La.R.S. 9:344.
However, in reaching that conclusion, we still must reverse the trial court's judgment awarding the Guillots specific visitation to Sebastian. In doing so, we find merit in the second assignment of error wherein Tommy and Dusty argue that the trial court erred in concluding that "extraordinary circumstances" exist in this matter, justifying application of La.Civ. Code art. 136(B). In reaching this conclusion, we recognize that the United States Supreme Court's decision in Troxel, 530 U.S. 57, 120 S.Ct. 2054, has rendered prior jurisprudence in this area of little assistance. The Supreme Court stopped short of declaring that all non-parent visitation statutes violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution. However, it found that the Washington statute was "breathtakingly broad," gave no weight to the parent's decision, and placed "the bestinterest determination solely in the hands of the judge." Id. at 67, 120 S.Ct. at 2061. It further noted that there was no allegation that the mother was an unfit parent and that "there is a presumption that fit parents act in the best interests of their children." Id. at 68, 120 S.Ct. at 2061. *1265 Given that fact, the Supreme Court stated that, "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Id. at 68-69, 120 S.Ct. at 2061.
In the matter before us, there is no allegation that either Tommy or Dusty are unfit or that Tommy does not adequately provide for Sebastian. The trial court decision constitutes a substitution of its judgment for the judgment of Sebastian's parents without a showing that the parents' decision is detrimental to the child. Such a judgment was specifically rejected in Troxel.
In finding merit in the second assignment of error, we need not reach the question of the constitutionality of La.Civ. Code art. 136(B) raised by Tommy and Dusty. Whether the inclusion of the five factors to be considered passes constitutional scrutiny under the Troxel analysis is left for another time.[3] We merely conclude that the evidence presented was not sufficient to reach the "extraordinary circumstances" threshold.

DISPOSITION
For the foregoing reasons, we reverse the trial court's judgment awarding Marvin and Dola Guillot specific visitation rights to their grandson, Sebastian T. Satchfield, and render judgment dismissing the demands of Marvin and Dola Guillot at their costs.
REVERSED AND RENDERED.
NOTES
[1] Initially, the Guillots named only Tommy as a defendant. However, in later pleadings, they joined Dusty and the State of Louisiana, through the Department of Social Services, Office of Family Support as party defendants.
[2] The record does not clearly establish the date of this marriage.
[3] We note that the Louisiana Legislature has referred this very question to the Louisiana Law Institute by House Concurrent Resolution No. 68 of the 2001 Regular Session.